UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 01-6069-Cr-ROETTGER

| | |
|---|---|
| UNITED STATES OF AMERICA, | ] |
| Plaintiff, | ] |
| v. | ] |
| | ] |
| RANDY WEAVER, | ] |
| Defendant. | ] |
| _____/ | |

**DEFENDANT WEAVER'S AFFIDAVIT IN SUPPORT OF HIS MOTION TO DISMISS INDICTMENT WITH PREJUDICE ON THE GROUNDS OF VINDICTIVE PROSECUTION, PRE-INDICTMENT DELAY, BAD FAITH, OUTRAGEOUS MISCONDUCT AND DUE PROCESS VIOLATIONS**

COMES NOW, Randy Weaver, the Defendant, through undersigned counsel, and does respectfully move this Honorable Court, pursuant to Federal Rules of Criminal Procedure, Rule 48(b), to Dismiss the Indictment in this matter With Prejudice, and in support of said motion, the Defendant would state the following:

(A). On June 22, 2000, the Defendant was arrested on an unrelated issue involving a Violation of Supervised Release, the Defendant was brought before the Honorable United States Magistrate Judge Lurana S. Snow, in which the Defendant moved the Court for an Identity Hearing.

(B). The Court scheduled an Identity Hearing for the 28th day of June, 2000, and the Defendant was detained. After said appearance on June 22,2000, the United States Marshals', James Meehan and Michael Gloetzner attempted to get the



Defendant's common-law wife to turn against the Defendant, by revealing the Defendnt's criminal record to her, and stating, "Randy deserves to be put away for life". It was after that comment on June 22, 2000, the Marshals went back to the Defendant's residence at approximately 6:30 p.m. and begun to "hunt" for evidence of criminal activity by the Defendant. When they (Marshals) found no weapons, it was then that the Marshals seized the Defendant's computer diskette's, V.C.R. Tapes, personal papers, income tax return, and possibly other property belonging to the Defendant. The Marshals' not only violated the Defendant's Fourth Amendment regarding the search, but were pre-disposed to have the Defendant "put away for life".

(C). The United States Marshals' without procuring any search warrant, apparently had received permission from a third party, Ms. Vicki Newson, a female Law Enforcement Official whom the Defendant had been living with. Instead of seizing any "weapons" the Marshals' removed numerous personal items belonging to the Defendant.

(D). On June 28, 2000, the same Marshals' that had arrested the Defendant on June 22, 2000, escorted the Defendant to the courtroom, but, on the way there, Deputy Marshal Michael Gloetzner removed an envelope from the Defendant's shirt pocket and began to read the contents of the same. Inside said envelope was a Motion to Quash Arrest Warrant; Motion to Challenge Magistrate's Detention Order and a Motion for the Suppression of Illegally seized Evidence. Along with said motions was a five-page letter the Defendant had written to his common-law wife.

(E). Upon Deputy Marshal Gloetzner's first seizing the envelope from the Defendant the Defendant had stated that it contained legal motions that were for defendant's attorney, Mr. Bernaldo Lopez. Defendant stated that him and his counsel were planning on attcking the illegal arrest, and that the Defendant was

-2-

aware that they (marshals') had returned to the Defendant's residence and conducted an illegal search, further, that the Defendant even had learned that the Marshals' seized personal V.C.R. Tapes of intimate acts between the Defendant and his common-law wife, and that another tape contained acts between the Defendant an a female friend.

(F). The Marshals' held said documents and discussed the contents of them between themselves, discussing how to approach the issue's in the legal motions if the Defendant raised the issue's. Just prior to going into the courtroom the Defendant was told that he better "not say a word" (referring to them reading the documents) and was handed back his legal documents. The Defendant immediately brought the issue to the attention of counsel, and even pointed out the Marshal as he walked pass.

(G). Immediately following the court appearance, the Defendant was instructed to face a holding cell and then Deputy United States Marshal Michael Gloetzner began to assault the Defendant.

(H). The Defendant was assaulted to such a degree, that the Marshals' had to summons a nurse from inside the building to treat the Defendant. On June 29, 2000, the Defendant did institute the beginning of a civil action by filing a document with the United States District Court Clerk, for the Southern District of Florida.

(I). The Defendant was then transferred out of the Federal Detention Center on July 5,2000, following an attempt by the Defendant's common-law wife to visit him and observe the Defendant's injuries.

(J). While in South Carolina, after being bounced to five different facilities, the Defendant continued to push the Civil action and it was from there that the Defendant contacted the State Attorney in Broward County, Mr. Michael Satz, who referred the Defendant to the Fort Lauderdale Police Department. The

Defendant had now began to seek the filing of criminal charges of assault against both Marshals'.

(K). The Defendant wrote to numerous Government agencies including the U.S. Justice Dept, the U.S. Inspector Generals' Office, the Office of Professional Responsibilities, and further. Defendant's common-law wife had begun to send out copies of the assault claims to different agencies as well.

(L). Further, is the fact that the Marshals' clearly knew that the Defendant had commenced civil action through a phone conversation from Defendant's counsel in South Carolina, Mr. Benjamin T. Stepp, who had a conversation with Deputy Marshal Meehan on August 14,2000, in which Deputy Meehan stated to counsel that he was only involved in the two payroll checks belonging to the Defendant that Defendant had signed to give to his common-law wife, and "that he (Meehan) didn't know whether he could/should talk to said counsel cause Randy has a lawsuit against him".

(M). On November 16,2000, the Defendant wrote a letter to Assistant United States Attorney, Debra Stuart of the same office that has now brought this malicious and vindictive prosecution, requesting that she initiate an investigation into the Defendant being assaulted by the Marshals'.

(N). The Defendant got no replies from any of his request, including his request to the United States Marshals' Office to surrender the illegally seized property to Defendant's common-law wife. The Defendant did file a complaint of assault with the Fort Lauderdale Police Department, and after their investigation of the assault, it was determined that the Defendant should address the issue to the Federal Bureau of Investigation.

(O). The Defendant was sentenced to One-Year for his Violation of Supervised Release, and was sent to the the Federal Correctional Institution in Miami,

-4-

Florida. It was not until the Defendant was about to be released did the Government initiate this criminal proceeding. The Defendant had only 46 days remaining on his sentence when the Government had him brought to F.D.C. Miami on a Writ.

(P). Additionally, while the Defendant was at the Federal Correctional Institution in Miami, a "confidential informant" by the name of Mr. Paul Detwieller, did intentionally steal a page from the Defendant's legal papers that gave the exact details of what the Defendant was alleging in reference to the Defendant being assaulted. This C.I. was caught in the act, and did surrender said document to a third party on April 15, 2001, the day after the C.I. stole said document. This can easily be confirmed by the actions taken against said individual by employee of the Federal Bureau of Prison's.

(Q). Further, the individual that witnessed the C.I. steal said document, was then placed in the "special housing unit" and accused of assaulting the Defendant. The Defendant was then informed that he had been set-up by an officer of said facility, and that the Defendant knew who set him up.

(R). Further, the Government provided the Defendant with a copy of his Civil Action suit during standard discovery. The issue of Vindictive Prosecution is apparent when the Government had said statements of the Marshals in June/July of 2000, and the Government never sought criminal action until the Defendant sought to file criminal charges against the Marshals' for assault, which he has brought to the attention of the proper law enforcement agency, the Federal Bureau of Investigation in Washington, D.C.

(S). The United States Government has pursued prosecution in this matter to deliberately interfere with the Defendant's civil action, causing a stay to be issued by the Honorable United States District Court Judge Paul C. Huck. The

Defendant has appealed said stay order, and the matter is before the Eleventh Circuit Court of Appeals. A favorable ruling in that matter is expected to be returned soon.

(T). The United States Attorney, Mr. Donald Chase, Esq., has presented fabricated facts and paraded lies and misleading evidence before the Grand Jury to inflame the Grand Jury against the Defendant (i.e. defendant's criminal record, and perjured statements by the Marshals' and possibly two inmates from Atlanta that alleged that the Defendant had made comments in reference to this case).

(U). The Defendant was clearly exercising his Constitutional rights when he filed his civil suit against the Marshals' and numerous other individuals for violating the Defendant's civil and constitutional rights, and this prosecution is retaliation for doing the same. The prosecution is based solely upon the fact that the Defendant will not concede and plead to a charge he is NOT GUILTY OF. The evidence of the Defendant being assaulted by the Marshals' is substantial, and the evidence that the Marshals' went to great lengths to cover-up this matter is even stronger.

(V). The Defendant incorporates these issue's as well in his discussion of Outrageous Misconduct and Bad Faith, and moves that based on all the facts stated herein the Indictment should be dismissed with Prejudice.

The Defendant also raises the issue of Pre-Indictment delay based on the following:

(A). The Defendant herein incorporates and make apart hereof the issue's raised under Vindictive Prosecution, and further states that the Dates in which the Marshals' had written their reports and the fact that the Government knew that the Defendant was in the custody of the Bureau of Prison's and that there was no discovery at all provided in this matter that leads the Defendant to believe that

-6-

the Government was investigating the allegation of the Marshals' tends to show that the Government intentionally withheld this prosecution so that the Government could gain a tactical advantage.

(B). Further, there is clear evidence and testimony provided to the defendant that the Government agents, Deputies Meehan and Gloetzner, and/or other's acting on their behalf did intentionally, knowingly and willfully destroy evidence to the crime that would've proven that the defendant was not guilty, and that the statements of the Marshals', James Meehan and Michael Gloetzner were filled with perjury and misleading and distorted facts, and allegations.

(C). Admission's to this fact were made by Deputy United States Marshal Johnnie Walker on the following date's.

(D). On May 4, 2001, immediately following the Defendant's initial appearance before the Honorable Magistrate Judge Lurana S. Snow, Deputy Marshal Walker made the following comment in reference to being asked by the Defendant,"What are you gonna do when I (defendant) have a forensic specialist come in here and use a chemical to locate my blood'? Deputy Marshal Walker replied,"What, do you think were stupid Weaver, we've had that cell cleaned twice since then." This comment was witnessed by other inmates that were present at court that day.

(E). On May 8, 2001, again Deputy Marshal Walker made the comment," Yes, there was a tan chair with blue cushions on it that used to sit outside Judge Snow's courtroom, but we've thrown it away." That comment was made after the Defendant, inquired as to what had happen to the chair that was there. (The reason the chair was discarded was due to the fact that when the Defendant first got assaulted by Deputy Marshal Gloetzner, Defendant was in shackles and had a cuff on his left wrist, and when the Defendant asked Deputy Gloetzner why he had slammed the handcuff on the Defendant's left wrist, Deputy Gloetzner, jerked the Defendant

hard to the right, causing the Defendant to fall, and strike his head on the chair. This caused a laceration to the Defendant's head, which left blood on the arm of the chair).

(F). On May 23, 2001, once again Deputy Marshal Walker gives incriminating evidence against the Government, when he informs the Defendant, "Oh, the Government is already prepared to offer those inmates a Rule 35 in this case". That comment was made by Deputy Walker when the Defendant intentionally asked Deputy Walker, while having inmates listen to the conversation,"What are they going to do when the Defendant calls all 15 inmates that were present at court that day?". This comment was witnessed by inmate Quinton Smith, whom subsequently has been acquitted of the Government's charge's against him).

(G). Further, the Marshals either themselves and/or someone acting on their behalf removed a surveillance camera that was located outside Magistrate Snow's courtroom, where the Marshals' assert that this is the location of the assault by the Defendant. Evidence that there was indeed a camera there is clear, by the poor patch job to the ceiling and the camera plug outlet that remains in the ceiling.

(H). Additionally, the double set of Olive Green doors located on the third floor outside the U.S. Marshals' Office have been stripped of their paint and as of May 23, 2001, were a "Rust" color. This was done to further eliminate incriminating evidence against the Marshals, cause that is the exact location where the Defendant was punched in the face by Marshal Gloetzner, while handcuffed behind his back and in shackles. Defendant had no way of defending himself against this unprovoked attacked by an officer of this Court. And, the Defendant's blood went all over the floor and on the door, and further left a trail of blood leading to the Marshals' Office.

(I). This is why there was such a delay, once the Marshals' became aware that

-8-

the Defendant was pursuing criminal charges against them, they had no choice but to alter the scene in the event the Federal Bureau of Investigation was called in to investigate. This also directly contributed to the delay, in that the Marshals' figured that the Defendant's civil action could be dragged out for years, and that the Defendant may back down at some point, but the Defendant seeking criminal charges changed all that.

(J). Oddly enough, this is now the only area in the Federal Building where inmates are escorted that is not monitored by a camera.

(K). The fact that the statements of the Marshal's also are very inconsistent with eachother, and that these statements were allegedly written by the Marshals' involved is proof that the Government had to move fast in this case, cause the statements aren't written by the Marshals' which is obvious by the phrasing used in the statements.

(L). Additionally, the Government stated in open court on record that the defendant was being served with a copy of the true bill indictment in this case, but, the Indictment that the Defendant was served is different from the Indictment that is in the possession of Defense counsel, Mr. Scott Sakin, P.A., this further leads to the deception involved in this case, and proof that the Government hurriedly indicted the Defendant. The Government had the Marshals' statements back in June/July of 2000, the Government had no reason at that time to delay in proceeding with there case, clearly the only purpose of the 10 month delay in this case was to gain a tactical advantage over the Defendant.

Wherefore, based upon the facts contained herein and incorporated hereto, the Defendant moves that this Honorable Court Dismiss the Indictment With Prejudice, and impose sanctions against the Government and the Marshals' Office.

The next issue the Defendant raises is that of Bad Faith. The Defendant

herein incorporates and makes apart hereof the issue's raised in the previous claims, and further states the following:

(A). The Defendant asserts that the degree of altering a crime scene, and the intentional use of perjured testimony, and the fact that the issue of the Defendant "allegedly" assaulting the Marshal's was never reported to even the Detention Center where the Defendant was being held, this is not only required by policy, but if the Defendant had supposedly assaulted the Marshal as the Government claims, then policy would've required that the Federal Detention Center be immediately notified, so that facility could take the appropriate actions to protect their officer's as well.

(B). This was confirmed to be policy, when on September 4, 2001, the Defendant spoke with the warden of said facility, Mrs. Monica Wetzel, who after being asked what would happen to an inmate if he was alleged to have assaulted someone while at a court appearance? Mrs. Wetzel stated that that inmate would immediately be placed in the "special housing unit", which is lock-down, so that she could assure the protection of her officer's.

(C). Further, Mrs. Wetzel then checked with Captain Lee, who is in charge of security at said facility, and it showed that no report was ever filed by the U.S. Marshals' alleging that the Defendant had assaulted anyone while at court, let alone a Marshal.

(D). Further, on September 5, 2001, the Defendant was asked to explain to Capt. Lee what the Defendant was inquiring about. The Defendant explained that the Defendant had been assaulted by the U.S. Marshals' back on June 28, 2000, and that the Defendant had filed a rather large civil action, in which this facility, Mrs Wetzel (warden) was named as a defendant, and that the U.S. Marshals' are now trying to claim that the Defendant had assaulted them. Capt. Lee confirmed that no

report was ever filed by the Marshals' and that he found it strange that the Marshals' would now be trying to charge the Defendant with an assault that happen supposedly in June 2000, and that the Marshals' never reported.

(E). The Defendant asserts that the Marshal's couldn't report the assault because then the Defendant would've been given medical treatment which would've clearly shown that the Defendant had been the one that got assaulted. Further, the Marshals' never even mentioned nothing about the incident, including the fact that the Nurse who seen the Defendant at the Courthouse had informed the Marshals' that the Defendant needed x-rays for his nose and shoulder. The Defendant asserts that this clearly amounts to bad faith, in that the Marshals' intentionally failed to report the incident to obstruct justice, cause evidence would've proved that the Marshals' had committed the crime of assault on the Defendant.

The next issue the Defendant raises is the issue of "Outrageous Misconduct", and the Defendant herein incorporates all previously mentioned issue's as applying to this issue as well, and would state the following:

(A). The Defendant asserts that the Due Process claims are intertwined with the issue of outrageous misconduct, and are hereby incorporated herein:

(B). In the instant case, the Defendant Weaver, asserts that the statements of Government agents, that being Deputy Marshals' James Meehan and Michael Gloetzner apparently were written "as dated" on June 28, 2000. On June 29,2000, the Defendant filed a "Notice of Intent to seek Civil and Criminal action" against the Marshals' for assaulting the Defendant. Due to the Defendant's filing of said document, Defendant Weaver was immediately transferred to (5) five different Federal Facilities in a blatant attempt to deny the Defendant medical treatment.

(C). Once Defendant arrived in South Carolina on July 17,2000, the Defendant continued to request medical treatment, none was given. Defendant then informed

-11-

the warden at said facility that the Defendant would add said facility and medical staff to civil action. On July 26, 2000, x-rays taken of the Defendant at the Spartanburg Regional Medical Center confirmed the Defendant's injuries, and that Defendant was schedule for nasal surgery on August 30, 2000.

(D). On August 14,2000, Attorney Benjamin T. Stepp, of the Federal Public Defender's Office contacted the United States Marshals' Office in Fort Lauderdale, and apparently spoke with Deputy U.S. Marshal James Meehan in reference to obtaining Defendant's illegally seized property, that the Marshals' had seized on June 22, 2000, without procuring any warrant. Further, The Defendant also had his New York State Attorney, Mr. Richard Marris, also contact the United States Marshals' Office in Fort Lauderdale, and was informed that if the Defendant wanted his property, that the Defendant could come get it himself when he gets released. This was to get the Defendant to return to the Marshals Office so that the Marshals could claim that the Defendant came after them.

(E). During said conversation, it was stated to counsel that, "I was only involved with the payroll checks, and that I don't know if I could or should talk with you cause Randy has a lawsuit against me". That establishes that the Marshals' knew of Defendant's lawsuit less than 16 days after Defendant was assaullted.

(F). While in South Carolina, the Government never indicted the Defendant, but once the Defendant made it clear that the Defendant was going to pursue criminal charges,and the Defendant did in fact seek action through the United States Justice Department, U.S. Inspector Generals Office, Office of Professional Responsibilities, States Law Enforcement and eventually the Federal Bureau of Investigation. Further, this issue was documented with the United States Supreme Court on November 16, 2000. It was not until April 5, 2001, that the Government indicted the Defendant.

(G). Further, the Government engaged in subornation of perjury when the

-12-

Government introduced the perjured statements, of the United States Marshals' and the two inmates, to the Grand Jury, to intentionally inflame the Grand Jury against the Defendant, thereby the Government violated the Defendant's due process rights.

(H). Defendant Weaver's case is clear, in that the Defendant filed a civil action approximately 10 months before the Government indicted the Defendant, on April 5, 2001. Further, evidence has been "intentionally" destroyed and/or altered, which severely hinders the Defendant's right to properly present the facts of this matter.

(I). The Defendant asserts that agents for the Government intentionally altered the scene, in which the Defendant has admissions to the tampering and destroying of physical evidence by an officer of the same U.S. Marshals' Office that assaulted the Defendant. In the instant case, a surveillance camera was physically removed from the location, in which the Defendant was first assaulted, a chair containing the Defendant's blood on it was thrown away and replaced with a different chair, of a similar design. Further, it was stated by this Deputy U.S. Marshal that the Government would give Rule 35 motions to inmates that were present that day in court, in order to assist that Government.

(J). Further, the Government engaged intentionally, willfully and knowingly in outrageous misconduct, when the Government knowingly used false testimony of two inmates in Atlanta, Ga. , in an attempt to intimidate this Defendant into pleading guilty by displaying substantial allegations in said statements of two of the Government's witnesses.

(K). The fact that the Government has now elected to not use these two witnesses, does not decrease the amount of damages done by the perjured statements. On the contrary, it caused the Defendant to re-focus his defense, so

that he could discredit these perjured statements.

(L). Further, these two statements were provided through discovery to the Defendant, and therefore, displays the intent of the Government to engage in this outrageous misconduct.

(M). The Defendant argues that the indictment in the instant case should be dismissed with prejudice, especially in view of the fact that the Government had every intention to use the perjured statements of witnesses Harold D. Neal, B.O.P. # 49721-019, and James W. Gurgis, B.O.P # 04292-025 and/or intimidate the Defendant into making a plea to a crime the Defendant is not guilty of.

(N). Especially, in view of the contents of these statements, not only would these statement clearly inflame the Grand Jury, but also any Petit Jury as well.

(O). Defendant claims that this amounts to "outrageous Misconduct" by the Government and clearly violated the Defendant's Due Process Rights. Further, it show's to what degree the Government has acted in bad faith. These are not the only perjured statements presented by the Government, and testimony was given before the Grand Jury by the United States Marshals Meehan and Gloetzner that obviously was perjury, especially when one looks to the statements provided by these individuals.

(P). Additionally, inmate James W. Gurgis, is listed as an "informant" by the Government, therefore this issue should rise to an investigation as to whether previous assistance provided by inmate Gurgis at the Government's behest violated someone else's due process rights as well, in any previous case which Gurgis testified for the Government.

(Q). Defendant asserts that based on the obvious variances between Deputy Meehan's and Deputy Gloetzner's statements, it would've caused any prudent prosecutor to further investigate the issue's in this case. When two individuals

-14-

are supposedly present at the same time and location and give different versions of what transpired, so different, that Deputy Meehan alleged that the Defendant swung or threw a punch at Deputy Gloetzner, and that Deputy Gloetzner allegedly "blocked" said punch, but yet, Deputy Gloetzner never sated the Defendant swung at him, or that he blocked any punch. That's because, Deputy Gloetzner knew the Defendant was in handcuffs and shackles, thereby making any attempt to hit the Marshal impossible.

(R). Further, the degree of variances in the Marshals' statements rise to such a level, that any testimony before the Grand Jury had to be that of perjury, and that the Government willingly condoned said perjury, in light of the fact that the Government had to have a copy of these statement's in question, prior to going to the Grand Jury. Further, the Defendant would move this Court to do an incamera inspection of the Grand Jury Minutes, to see if the statements by the two inmates were read to the Grand Jury.

(S). Not only has the Government allowed perjury by the Government's witnesses, but the Government also joined in on the perjury on several different occasions. First, was on May 4, 2001, in front of the Honorable Magistrate Judge Lurana S. Snow, in which, at the Defendant's initial appearance the Government stipulated "on record" that the Government was serving the Defendant with a copy of the "true Bill" indictment in this case. Defendant immediately noticed errors throughout said indictment, but waited to raise them, to see if the Government would engage in more "outrageous Misconduct". Defendant Weaver confirmed his suspicions, when he finally met with court appointed counsel, Mr. Scott Sakin, P.A., and Defendant requested to see a copy of the indictment counsel had. Sure enough, the indictment was now different, therefore, the Government committed perjury when the Government stated they had served the Defendant with a "true

-15-

Copy".

(T). The next issue of outrageous misconduct in the form of "intentional perjury" came on May 8, 2001, when the Government, in a deliberate plot to prevent the Defendant from receiving bond, lied to the Court and stated that the Defendant had been "convicted" of numerous assault and batteries, "RAPE" and bribing a witness. The Government had supposedly had this case since June 2000, so the Government knew very well what "convictions" the Defendant actually had. The Government lied and slandered the Defendant in "open court".

(U). Further, the Government clearly had access to a recent Pre-Sentence Report (P.S.I.) done on the Defendant in October 2000, in which that report revealed that the Defendant only had three-misdemeanor convictions and one-felony conviction, far below anything the Government alleged. This perjury in and of itself, clearly violated the Defendant's right to due process. Because of the issue's of perjury in this case, apply directly to the Defendant's guilt or innocence, the Defendant moves for Dismissal of Indictment With Prejudice.

**WHEREFORE,** all of the issue's stated herein, clearly show not only outrageous misconduct on behalf of the Government, but also a blatant disregard for the Defendant's due process rights, and clear disrespect for this Court.

Therefore, based upon the foregoing, the Defendant moves through counsel, to Dismiss the Indictment With Prejudice against the Defendant for Assault on a Federal Marshal in violation of 18 U.S.C. §111(a)(1), and that the Court grant any such other relief as this Court deems just and proper.

## MEMORANDUM OF LAW

"Due Process clause of the Fifth Amendment requires dismissal of indictment if a defendant shows that pre-indictment delay caused actual prejudice to the

defendant, and that the delay was product of deliberate action by the government to gain a tactical advantage". See United States v. Marion, 404 U.S. at 324, 92 S.Ct. at 465; United States v. Townley, 665 F.2d 579, 581-82 (5th Cir.) cert. den'd, 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982); United States v. Hendricks, 661 F.2d 38, 39-40 (5th Cir. 1981); United States v. Nixon, 634 F.2d 306, 310 (5th Cir.) cert. den'd, 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed. 2d 103 (1981); United States v. Willis, 583 F.2d 203, 207-08 (5th Cir. 1978). "The due process inquiry must consider the reasons for the delay as well as the prejudice to the accused". See United States v. Lovasco, 431 U.S. at 790, 97 S.Ct. at 2048.

A defendant's showing of prejudice triggers a sensitive balancing of the government's need for an investigative delay...against the prejudice asserted by the defendant". See United States v. Brand, 556 F.2d 1312 (5th Cir. 1977)[n.3].

" Pre-indictment delay can violate the due process clause of the Fifth Amendment even where the defendant has not been arrested or otherwised accused before the indictment", citing Marion, Supra..."Government's concession that due process would require dismissal when an intentional tactical delay by a prosecutor substantially prejudiced the defendant"

In United States v. Michael, 17 F.3d 1383 (11th Cir. 1994), the court held "that the knowing use of perjured testimony requires reversal." (citing also DeMarco v. United States, 928 F.2d 1074 (11th Cir. 1991), in which the court vacated the conviction.

The Government's use of perjured testimony, be it actual testimony at trial or in the form of statements which did or could've been presented to the Grand Jury, and which caused the defendant the unnecessary distraction in the preparation of his case for trial violates Gigilo v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed. 2d 104 (1972). The Supreme Court said,"[a]s long

-17-

ago as Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935), this court made it clear that deliberate deception of a court and jurors by the "presentation" of known false evidence is incompatible with 'rudimentary demands of justice'. This is reaffirmed in Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed.214 (1942).

In United States v. Cole, 755 F.2d 748, 763 (11th Cir. 1985), the court said, Thus, "[t]he thrust of Giglio and its progeny has been to ensure that the jury knows the facts that might motivate a witness in giving testimony..." Brown v. Wainright, 785 F.2d 1457, 1465 (11th Cir. 1986).

In DeMarco, Supra at 1077 [D], the court stated that a conviction must be overturned which rests in part upon the knowing use of false testimony if there is any reasonable likelihood that the false testimony could have affected the judgement of the jury." See United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

In United States v. Michael, Supra, the court stated, "It is axiomatic that only the knowing use of false testimony constitutes a due process violation". Citing, United States v. Lopez, 985 F.2d 520, 524 (11th Cir. 1993); United States v. Meros, 866 F.2d 1304, 1309 (11th Cir.) cert. den'd, 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989); United States v. Willis, 759 F.2d 1486, 1502 (11th Cir.) cert. den'd, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed. 2d 119 (1985).

Wherefore, the Defendant asserts that the actions of the Government and it's agents in this case warrant the Dismissal of the Indictment With Prejudice, and therefore prays that this Honorable Court grant Defendant such relief, and any other relief as this Court may deem just and proper.

-18-

Respectfully Submitted,

_____
Randy Weaver
Defendant/Pro Se
#92903-071
Federal Detention Center
P.O. Box 019120
Miami, Florida 33101-9120

-19-

**CERTIFICATE OF SERVICE AND MAILING**

I HEREBY CERTIFY, that I did personally cause to be served upon the Assistant United States Attorney, Donald Chase, Esq., a true and correct copy of the foregoing, by depositing the same in the United States Mail, postage preipaid, on this 21st day of September, 2001.

A copy was also furnished to the Clerk of Court as well, and copies were sent to the following addresses for said individuals:

To: The Honorable Clerk of Court
United States District Court
299 East Broward Boulevard
Fort Lauderdale, Florida 33301

&

To: The Honorable Donald Chase, Esq.,
Assistant United States Attorney
500 East Broward Boulevard
Fort Lauderdale, Florida 33394

By: *[signature]*

Randy Weaver
Defendant/Pro Se
# 92903-071
Federal Detention Center
P.O. Box 019120
Miami, Florida 33101-9120